# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARILYN FARLEY,<br><br>        Plaintiff,<br><br>  v.<br><br>MONMOUTH REAL ESTATE INVESTMENT CORPORATION, KIERAN CONWAY, DANIEL D. CRONHEIM, CATHERINE B. ELFLEIN, BRIAN H. HAIMM, NEAL HERSTIK, MATTHEW I. HIRSCH, EUGENE W. LANDY, MICHAEL P. LANDY, SAMUEL A. LANDY, KEVIN S. MILLER, GREGORY T. OTTO, SONAL PANDE, and SCOTT L. ROBINSON,<br><br>        Defendants. | Civil Action No.<br><br>**COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Marilyn Farley ("Plaintiff") by and through her undersigned attorneys, brings this action on behalf of herself, and alleges the following based upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which includes, without limitation: (a) review and analysis of public filings made by Monmouth Real Estate Investment Corporation ("Monmouth" or the "Company") and other related parties and non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, shareholder communications, and postings on the Company's website concerning the Company's

public statements; and (d) review of other publicly available information concerning Monmouth and the Defendants.

## SUMMARY OF THE ACTION

1.      This is an action brought by Plaintiff against Monmouth and the Company's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78n(a), 78t(a), and SEC Rule 14a-9, 17 C.F.R. 240.14a-9, in connection with the proposed merger of the Company with Equity Commonwealth (the "Proposed Transaction").

2.      On May 4, 2021, the Company entered into an Agreement and Plan of Merger (the "Merger Agreement") with Equity Commonwealth.  Pursuant to the terms of the Merger Agreement the Company's shareholders will have the right to receive 0.67 shares of Equity Commonwealth stock for every share of Monmouth stock owned (the "Merger Consideration").

3.      On July 23, 2021, in order to convince the Company's shareholders to vote in favor of the Proposed Transaction, the Board authorized the filing of a materially incomplete and misleading Proxy Statement with the SEC (the "Proxy Statement"), in violation of Sections 14(a) and 20(a) of the Exchange Act.

4.      For these reasons, and as set forth in detail herein, Plaintiff asserts claims against Monmouth and the Board for violations of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9.  Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction unless and until the material information discussed below is disclosed to Monmouth shareholders before the vote on the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Defendants' violations of the Exchange Act.

## JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over all claims asserted herein pursuant to Section 27 of the Exchange Act, 15 U.S.C § 78aa, and 28 U.S.C. § 1331, as Plaintiff alleges violations of Sections 14(a) and 20(a) of the Exchange Act.

6.      This Court has personal jurisdiction over all of the Defendants because each is either a corporation that conducts business in, solicits shareholders in, and/or maintains operations within, this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

7.      Venue is proper under 28 U.S.C. § 1391 because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## THE PARTIES

8.      Plaintiff is, and has been at all times relevant hereto, the owner of Monmouth shares.

9.      Defendant Monmouth is incorporated under the laws of Maryland and has its principal executive offices located at 101 Crawfords Corner Road, Suite 1404, Holmdel, New Jersey 07733.  The Company's common stock trades on the New York Stock Exchange under the symbol "MNR."

10.      Defendant Kieran Conway ("Conway") is and has been a Monmouth director at all times during the relevant time period.

11.      Defendant Daniel D. Cronheim ("Cronheim") is and has been a Monmouth director at all times during the relevant time period.

12.     Defendant Catherine B. Elfhein ("Elfheim") is and has been a Monmouth director at all times during the relevant time period.

13.     Defendant Brian H. Haimm ("Haimm") is and has been a Monmouth director at all times during the relevant time period.

14.     Defendant Neal Herstik ("Herstik") is and has been a Monmouth director at all times during the relevant time period.

15.     Defendant Matthew I. Hirsch ("Hirsch") is and has been a Monmouth director at all times during the relevant time period.

16.     Defendant Eugene W. Landy ("Eugene Landy") is and has been the Chairman of the Board of Monmouth at all times during the relevant time period.

17.     Defendant Michael P. Landy ("Michael Landy") is and has been the President, Chief Executive Officer ("CEO") and a Monmouth director at all times during the relevant time period.

18.     Defendant Samuel A. Landy ("Samuel Landy") is and has been a Monmouth director at all times during the relevant time period.

19.     Defendant Kevin S. Miller ("Miller") is and has been a Monmouth director at all times during the relevant time period.

20.     Defendant Gregory T. Otto ("Otto") is and has been a Monmouth director at all times during the relevant time period.

21.     Defendant Sonal Pande ("Pande") is and has been a Monmouth director at all times during the relevant time period.

22.     Defendant Scott L. Robinson ("Robinson") is and has been a Monmouth director at all times during the relevant time period.

23.     Defendants Conway, Cronheim, Elfheim, Haimm, Herstik, Hirsch, Eugene Landy, Michael Landy, Samuel Landy, Miller, Otto, Pande, and Robinson are collectively referred to herein as the "Individual Defendants."

24.     The Individual Defendants, along with Defendant Monmouth, are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

25.     Monmouth is one of the oldest public equity REITs in the world. Monmouth specializes in single tenant, net-leased industrial properties, subject to long-term leases, primarily to investment grade tenants. Monmouth is a fully integrated and self-managed real estate company, whose property portfolio consists of 120 properties, containing a total of approximately 24.5 million rentable square feet, geographically diversified across 31 states.

### The Company Announces the Proposed Transaction

26.     On May 4, 2020, the Company jointly issued a press release announcing the Proposed Transaction.  The press release stated in part:

CHICAGO & HOLMDEL, N.J.--(BUSINESS WIRE)--Equity Commonwealth (NYSE: EQC) and Monmouth Real Estate Investment Corporation (NYSE: MNR), or Monmouth, today announced that they have entered into a definitive merger agreement by which Equity Commonwealth will acquire Monmouth in an all-stock transaction, valued at approximately $3.4 billion, including the assumption of debt. The combined company is expected to have a pro forma equity market capitalization of approximately $5.5 billion.

Under the terms of the agreement, Monmouth shareholders will receive 0.67 shares of Equity Commonwealth stock for every share of Monmouth stock they own. Based on the closing price for Equity Commonwealth on May 4, 2021, this represents approximately $19.40 per Monmouth share. The merger agreement provides for Monmouth to declare and pay one additional regular quarterly common stock dividend of $0.18 per share without Equity Commonwealth paying a corresponding common dividend to its shareholders. Accordingly, the total

consideration to be received by the Monmouth shareholders in the transaction is $19.58 per Monmouth share.

Equity Commonwealth and Monmouth shareholders are expected to own approximately 65% and 35%, respectively, of the pro forma company following the close of the transaction.

"The transaction provides Equity Commonwealth with a high-quality, net-leased industrial business with stable cash flows while preserving EQC's balance sheet capacity for future acquisitions," said Sam Zell, Chairman of the Board of Equity Commonwealth.

"Monmouth provides an attractive and scalable platform," said David Helfand, President, Chief Executive Officer and Trustee of Equity Commonwealth. "With significant cash and balance sheet capacity, we have the ability to grow the platform and create long-term value for shareholders."

Monmouth's portfolio is comprised of 120 properties totaling 24.5 million square feet.[1] In addition, Monmouth has 6 properties totaling 1.8 million square feet under contract and leased to investment grade tenants. Closings for these acquisitions are expected in 2021 and 2022.

"Following a strategic alternatives process, our Board unanimously determined that the merger with Equity Commonwealth is the best outcome to maximize value for Monmouth stockholders," said Michael P. Landy, President and CEO of Monmouth. "Our stockholders will benefit from Equity Commonwealth's preeminent leadership team, which has an exceptional track record of delivering shareholder value, its strong balance sheet and its focused strategy to build on Monmouth's over 50 years of success creating a market leading industrial REIT."

**Strategic and Financial Rationale**

- **Attractive entry point into a fast-growing sector with robust long-term fundamentals.** The transaction provides the companies' shareholders the opportunity to build a leading industrial business and participate in the long-term growth of the sector.

- **Balance of scale, stability and growth.** The income stability of the portfolio, coupled with Equity Commonwealth's sponsorship and strong balance sheet, is expected to provide the combined company with stable recurring cash flows and significant dry powder for future acquisitions.

- **High-quality properties.** The portfolio consists of single tenant, net-leased industrial assets, geographically located across 31 states with a focus on the Eastern United States. Many properties are near airports, seaports, transportation hubs, and situated within or near major population centers,

positioning the portfolio well to serve both the first and last mile of the supply chain. With a weighted average building age of 9.9 years, much of the portfolio consists of Class A logistics facilities, featuring modern specs and building features.

- **Fully-funded growth strategy.** Equity Commonwealth is well-positioned to execute on its growth strategy, which is not dependent on raising additional debt or equity capital. Upon closing of the acquisition, Equity Commonwealth is expected to have approximately $2.5 billion of pro forma cash on the balance sheet. Further, Equity Commonwealth plans to dispose of its four office properties totaling 1.5 million square feet and Monmouth's portfolio of marketable securities over time and reinvest the proceeds in future acquisitions.

- **Improved leverage.** Post-merger shareholders are expected to benefit from an improved leverage profile. Equity Commonwealth expects to pay $25 per share plus accrued distributions to cash out Monmouth's $550 million 6.125% Series C Redeemable Preferred Stock in connection with the merger. This is anticipated to create immediate savings of approximately $34 million per annum. Equity Commonwealth has a conservative financing strategy and anticipates long-term leverage targets to be in line with the industrial REIT sector.

- **Increased diversification over time.** For the three months ending March 31, 2021, Monmouth's largest tenant accounts for 55% of Monmouth's annual rent. Equity Commonwealth plans to diversify its tenant base and industry concentrations as the portfolio grows.

**Leadership and Governance**

Strong corporate governance will continue to be paramount at Equity Commonwealth. The company will continue to be led by President and Chief Executive Officer David Helfand and the existing senior management team. Upon closing, the number of trustees on Equity Commonwealth's board will be expanded to 10, with two individuals designated by Monmouth's board. Sam Zell will remain the Chairman of the Board of Trustees.

**Dividend Policy**

Monmouth plans to continue to pay its regular quarterly common stock dividend and its Series C Cumulative Redeemable Preferred Stock dividend between signing and closing of the transaction.

Equity Commonwealth expects to begin paying a quarterly dividend after the transaction has closed. The Board of Trustees will determine the timing and amount of the dividend.

**Transaction Timing & Approval**

The transaction is expected to close during the second half of 2021, subject to customary closing conditions, including approval by the common shareholders of both Equity Commonwealth and Monmouth.

The Board of Trustees of Equity Commonwealth and the Board of Directors of Monmouth Real Estate have each unanimously approved the transaction.

**Advisors**

Goldman Sachs & Co. LLC is acting as financial advisor and Fried, Frank, Harris, Shriver and Jacobson LLP is serving as legal advisor to Equity Commonwealth. J.P. Morgan Securities LLC and CS Capital Advisors, LLC are acting as financial advisors and Strook & Stroock & Lavan LLP is serving as legal advisor to Monmouth.

## FALSE AND MISLEADING STATEMENTS
## AND/OR MATERIAL OMISSIONS IN THE PROXY STATEMENT

27.     On July 23, 2021, the Company authorized the filing of the Proxy Statement with the SEC.  The Proxy Statement recommends that the Company's shareholders vote in favor of the Proposed Transaction.

28.     Defendants were obligated to carefully review the Proxy Statement prior to its filing with the SEC and dissemination to the Company's shareholders to ensure that it did not contain any material misrepresentations or omissions.   However, the Proxy Statement misrepresents and/or omits material information that is necessary for the Company's shareholders to make informed decisions regarding whether to vote in favor of the Proposed Transaction, in violation of Sections 14(a) and 20(a) of the Exchange Act.

### Material False and Misleading Statements or Material
### Misrepresentations or Omissions Regarding the Company's Financial Projections

29.     The Proxy Statement contains projections prepared by the Company's and Equity Commonwealth's management concerning the Proposed Transaction, but fails to provide material information concerning such.

30.     The SEC has repeatedly emphasized that disclosure of non-GAAP projections can be inherently misleading, and has therefore heightened its scrutiny of the use of such projections.[1]  Indeed, on May 17, 2016, the SEC's Division of Corporation Finance released new and updated Compliance and Disclosure Interpretations ("C&DIs") on the use of non-GAAP financial measures that demonstrate the SEC's tightening policy.[2]  One of the new C&DIs regarding forward-looking information, such as financial projections, explicitly requires companies to provide any reconciling metrics that are available without unreasonable efforts.

31.     In order to make management's projections included in the Proxy Statement materially complete and not misleading, Defendants must provide a reconciliation table of the non-GAAP measures to the most comparable GAAP measures.

32.     Specifically, with respect to Equity Commonwealth's *EQC on a Stand-alone Basis* Projections, Equity Commonwealth must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) EBITDA; (ii) Adjusted EBITDA; (iii) Funds from Operations; and (iv) Unlevered Free Cash Flows.

33.     With respect to Equity Commonwealth's *MNR on a Stand-alone Basis* Projections, Equity Commonwealth must disclose the line item projections for the financial

---

[1] *See, e.g.*, Nicolas Grabar and Sandra Flow, Non-GAAP Financial Measures: The SEC's Evolving Views, Harvard Law School Forum on Corporate Governance and Financial Regulation (June 24, 2016), *available at* https://corpgov.law.harvard.edu/2016/06/24/non-gaap-financial-measuresthesecs evolving-views/; Gretchen Morgenson, Fantasy Math Is Helping Companies Spin Losses Into Profits, N.Y. Times, Apr. 22, 2016, available at http://www.nytimes.com/2016/04/24/business/fantasy-mathis-helping-companies-spin-ossesinto-profits.html?_r=0.

[2] Non-GAAP Financial Measures, Compliance & Disclosure Interpretations, U.S. SECURITIES AND EXCHANGE COMMISSION (May 17, 2017), *available at* https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

metrics that were used to calculate the non-GAAP measures, including: (i) EBITDA; (ii) Adjusted EBITDA; (iii) Funds from Operations; and (iv) Unlevered Free Cash Flows.

34.     With respect to Equity Commonwealth's *Combined Company on a Pro Forma Basis Giving Effect to the Merger* Projections, Equity Commonwealth must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) EBITDA; (ii) Adjusted EBITDA; (iii) Funds from Operations; and (iv) Unlevered Free Cash Flows.

35.     With respect to Monmouth's *MNR Multi-Year Projected Financial Information*, the Company must disclose the line item projections for the financial metrics that were used to calculate the non-GAAP measures, including: (i) EBITDA; (ii) Adjusted EBITDA; (iii) Cash Net Operating Income; (iv) Funds from Operations per share; and (v) Adjusted Funds from Operations per share.

36.     Disclosure of the above information is vital to provide investors with the complete mix of information necessary to make an informed decision when voting on the Proposed Transaction.   Specifically, the above information would provide shareholders with a better understanding of the analyses performed by the Company's financial advisor in support of its opinion.

## Material False and Misleading Statements or Material Misrepresentations or Omissions Regarding the Financial Opinions

37.     The Proxy Statement contains the financial analyses and opinion of J.P. Morgan Securities LLC ("J.P. Morgan") and CSCA Capital Advisors, LLC ("CSCA") and concerning the Proposed Transaction, but fails to provide material information concerning such.

38.     With respect to J.P. Morgan's *Public Trading Multiples* A*nalysis* for Monmouth, the Proxy Statement fails to disclose the individual multiples and metrics for the companies observed in the analysis.

39.     With respect to J.P. Morgan's *Transaction Multiples Analysis*, the Proxy Statement fails to disclose the individual multiples and metrics for the Gramercy Acquisition and the reason only one transaction was observed by J.P. Morgan.

40.     With respect to J.P. Morgan's *Discounted Cash Flow Analysis*, the Proxy Statement fails to disclose: (i) the unlevered free cash flows for Monmouth, (ii) the range of terminal values for Monmouth and Equity Commonwealth; (iii) the inputs and assumptions underlying J.P. Morgan's use of the range of perpetual growth rates of 1.75% to 2.25% for Monmouth and 2.00% to 2.50% for Equity Commonwealth; (iv) the estimates of the net operating income for Equity Commonwealth at the end of fiscal-year 2025; (v) the inputs and assumptions underlying J.P. Morgan's use of the discount rates ranging from 6.25% to 6.75% for Monmouth and 6.50% to 7.00% for Equity Commonwealth; (vi) the weighted average cost of capital of Monmouth and Equity Commonwealth; and (vii) the net debt and other adjustments for Monmouth and Equity Commonwealth as of March 31, 2021.

41.     With respect to CSCA's *Selected Comparable Companies Analysis* for Monmouth and Equity Commonwealth, the Proxy Statement fails to disclose the individual multiples and metrics for the companies observed in the analysis.

42.     With respect to CSCA's *Selected Precedent Transactions Analysis*, the Proxy Statement fails to disclose the individual multiples and metrics for the transactions observed in the analysis.

43.     With respect to CSCA's *Capitalization Rate Valuation Analysis*, the Proxy Statement fails to disclose: (i) the inputs and assumptions underlying CSCA's use of cash capitalization rates from 4.75% to 5.50% for Monmouth and 4.50% to 6.00% for Equity Commonwealth.

44.     With respect to CSCA's *Premiums Paid Analysis*, the Proxy Statement fails to disclose:(i) the transactions selected for the analysis; (ii) the premiums observed for each of the transactions reviewed; (iii) the date of announcement for each transaction; (iv) the closing date of each transaction.

45.     With respect to CSCA's *Discounted Cash Flow Analysis* for Monmouth, the Proxy Statement fails to disclose: (i) the unlevered free cash flows for Monmouth, (ii) the range of terminal values for Monmouth; (iii) the inputs and assumptions underlying CSCA's use of the range of EBITDA multiples ranging from 18.0x to 22.0x; (iv) the inputs and assumptions underlying CSCA's use of the discount rates ranging from 6.50% to 7.00%; and (v) the weighted average cost of capital of Monmouth.

46.     With respect to CSCA's *Discounted Cash Flow Analysis* for Equity Commonwealth, the Proxy Statement fails to disclose: (i) the unlevered free cash flows for Equity Commonwealth for fiscal years ending 2024 and 2025, (ii) the range of terminal values for Equity Commonwealth; (iii) the inputs and assumptions underlying CSCA's use of the range of EBITDA multiples ranging from 14.0x to 16.0x; (iv) the inputs and assumptions underlying CSCA's use of the discount rates ranging from 6.75% to 7.25%; and (v) the weighted average cost of capital of Equity Commonwealth.

47.     When a banker's endorsement of the fairness of a transaction is touted to shareholders, the valuation methods used to arrive at that opinion as well as the key inputs and

range of ultimate values generated by those analyses must also be fairly disclosed.  Moreover, the disclosure of projected financial information is material because it provides shareholders with a basis to project the future financial performance of a company and allows shareholders to better understand the financial analyses performed by the Company's financial advisor in support of its fairness opinion.

48.     Without the above described information, the Company's shareholders are unable to cast a fully informed vote on the Proposed Transactions.  Accordingly, in order to provide shareholders with a complete mix of information, the omitted information described above should be disclosed.

### COUNT I

**(Against All Defendants for Violations of Section 14(a)
of the Exchange Act and Rule 14a-9 Promulgated Thereunder)**

49.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

50.     Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

51.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that communications with stockholders in a recommendation statement shall not contain "any statement which, at the time and in the light of the circumstances under which it is

13

made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

52.     Defendants have issued the Proxy Statement with the intention of soliciting shareholders support for the Proposed Transaction. Each of the Defendants reviewed and authorized the dissemination of the Proxy Statement, which fails to provide critical information regarding, among other things, the financial projections for the Company.

53.     In so doing, Defendants made untrue statements of fact and/or omitted material facts necessary to make the statements made not misleading. Each of the Defendants, by virtue of their roles as officers and/or directors, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a). The Defendants were therefore negligent, as they had reasonable grounds to believe material facts existed that were misstated or omitted from the Proxy Statement, but nonetheless failed to obtain and disclose such information to shareholders although they could have done so without extraordinary effort.

54.     The Defendants knew or were negligent in not knowing that the Proxy Statement is materially misleading and omits material facts that are necessary to render it not misleading. The Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction.

55.     The Defendants knew or were negligent in not knowing that the material information identified above has been omitted from the Proxy Statement, rendering the sections of the Proxy Statement identified above to be materially incomplete and misleading. Indeed, the Defendants were required to be particularly attentive to the procedures followed in preparing the Proxy Statement and review it carefully before it was disseminated, to corroborate that there are

no material misstatements or omissions.

56.     The Defendants were, at the very least, negligent in preparing and reviewing the Proxy Statement. The preparation of a Proxy Statement by corporate insiders containing materially false or misleading statements or omitting a material fact constitutes negligence. The Defendants were negligent in choosing to omit material information from the Proxy Statement or failing to notice the material omissions in the Proxy Statement upon reviewing it, which they were required to do carefully as the Company's directors. Indeed, the Defendants were intricately involved in the process leading up to the signing of the Merger Agreement and the preparation of the Company's financial projections.

57.     The misrepresentations and omissions in the Proxy Statement are material to Plaintiff, who will be deprived of his right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.

58.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

### COUNT II

**(Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act)**

59.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

60.     The Individual Defendants acted as controlling persons of Monmouth within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Monmouth, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in

the Proxy Statement filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

61.     Each of the Individual Defendants was provided with, or had unlimited access to, copies of the Proxy Statement and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

62.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy Statement at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were thus directly involved in preparing this document.

63.     In addition, as set forth in the Proxy Statement sets forth at length and described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy Statement purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

64.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the Exchange Act.

65.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by

their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual Defendants' conduct, Plaintiff will be irreparably harmed.

66.     Plaintiff has no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for judgment and relief as follows:

A.     Preliminarily and permanently enjoining Defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

B.     Directing the Individual Defendants to disseminate an Amendment to the Proxy Statement that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

C.     Directing Defendants to account to Plaintiff for all damages sustained because of the wrongs complained of herein;

D.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

E.     Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: July 26, 2021                                      Respectfully submitted,

                                                          By: */s/ Joshua M. Lifshitz*
                                                          Joshua M. Lifshitz
                                                          Email: jml@jlclasslaw.com

**LIFSHITZ LAW FIRM, P.C.**
1190 Broadway,
Hewlett, New York 11557
Telephone: (516) 493-9780
Facsimile: (516) 280-7376

*Attorneys for Plaintiff*